**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| CRAIG C. CUMMINGS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:11-cv-858-TWP-TAB |
| | ) | |
| MICHAEL ASTRUE, | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |

**ENTRY ON JUDICIAL REVIEW**

Plaintiff, Craig C. Cummings ("Mr. Cummings"), requests judicial review of the decision of the Defendant, Michael J. Astrue, Commissioner of the Social Security Administration ("the Commissioner"), which in part denied Mr. Cummings' application for Disability Insurance Benefits ("DIB") for the period of disability from January 16, 2007 through September 2, 2009. For the reasons set forth below, the Commissioner's decision is **REMANDED** for further proceedings consistent with this opinion.

**I. BACKGROUND**

Mr. Cummings was born on September 3, 1959, making him 47 years old at the time of the alleged onset date of January 16, 2007 and 50 years old on September 3, 2009. (R. at 55.) Mr. Cummings has at least a high school education (R. at 209), as well as past relevant work experience as a carpenter. (R. at 209)

A.      **Procedural History**

On June 5, 2007, Mr. Cummings filed an application for DIB alleging that he became disabled on January 16, 2007 due to osteoarthritis of the right hip with total right hip replacement.  (R. at 118, 161, 165.)  Mr. Cummings's application was denied initially (R. at 55), and upon reconsideration.  (R. at 56.)  On November 5, 2009, Mr. Cummings appeared with counsel and testified at a hearing before Administrative Law Judge Peter C. Americanos (the "ALJ").  (R. at 30-45.)  Richard A. Hutson, M.D., a medical expert, and Robert Barber, a vocational expert (the "VE"), testified at the hearing as well.  (R. at 45-54.)  On January 29, 2010, the ALJ issued a decision finding that Mr. Cummings was disabled on September 3, 2009 and remained so through the date of the ALJ's decision. However, the ALJ also ruled that prior to September 3, 2009, Mr. Cummings was not disabled because he could perform a significant number of sedentary jobs.  (R. at 18, 24-25.)  Mr. Cummings appealed the latter part of the ALJ's partially favorable decision.   On April 28, 2011, the Appeals Council denied Mr. Cummings's request for a review of the ALJ's decision.  (R. at 1.)  As a result, the ALJ's decision is the final decision of the Commissioner.  *See* 20 C.F.R. § 404.981 (2012).

B.      **Medical History**

On September 30, 2003, Mr. Cummings was seen in a follow-up for his knee, having had ACL reconstruction and meniscus surgery in 2003.  (R. at 212 and 229.)  At that time, Mr. Cummings had been back at work and was doing well except for some difficulty in climbing and soreness at the end of the workday.  *Id.*  His examination revealed that he had good stability, good range of motion and some patella tendonitis.  *Id.*  Mr. Cummings was released to return to full time work and given a disability rating of 3% of the whole body and 7% of the lower extremity based on the 5th Edition of the AMA Guidelines.  *Id.*

2

On January 3, 2007, orthopedic surgeon John B. Meding, M.D., assessed Mr. Cummings's hip condition.  (R. at 240.)  Mr. Cummings had been suffering from right hip pain for a long time, and the pain had gotten progressively worse since he dislocated his hip in a 1986 motor vehicle accident.  *Id.*  Dr. Meding found that Mr. Cummings ambulated with an antalgic component and a short leg gait.  *Id.*  He had 70º of flexion, 20º of internal rotation and -20º of external rotation.  *Id.*  X-rays showed complete right hip cartilage space loss with osteophytosis and sclerosis consistent with osteoarthritis right hip.  (R. at 241.)  Dr. Meding opined that total hip replacement was the only reasonable treatment option for Mr. Cummings.  *Id.*

On January 25, 2007, Stephen S. Luther, M.D., completed a perioperative evaluation of Mr. Cummings at the request of Dr. Meding to determine whether he could undergo a right hip replacement due to severe osteoarthritis of the right hip.  (R. at 228-31).  Based upon the "Activity Questionnaire" filled out by Mr. Cummings, Dr. Luther indicated that Mr. Cummings was able to perform heavy, manual work; this determination was evidenced by the fact that, in the previous week, Mr. Cummings had put up drywall for a ceiling as part of his work as a carpenter. (R. at 230).  Dr. Luther's assessment of Mr. Cummings included a diagnosis of severe debilitating osteoarthritis with a plan for a total right hip replacement, and a diagnosis of hypertension, chronic obstructive pulmonary disease, morbid obesity, hypercholesterolemia and gastroesophageal reflux disease.  (R. at 231).  Dr. Luther determined that Mr. Cummings was clinically stable from a medical perspective and able to undergo surgery.  *Id.*

On February 1, 2007, Mr. Cummings underwent a total right hip replacement performed by Dr. Meding.  (R. at 234-37).  Mr. Cummings was discharged on February 3, 2007 with instructions to have a wound and range of motion check in two weeks, to visit Dr. Meding in six weeks after surgery, and to bear no body weight on his right leg and use either a walker or

crutches for eight weeks after surgery.  (R. at 225-27).  Mr. Cummings was also discharged with a prescription for Lortab 7.5/700, to take 1 to 2 tablets every 4 to 6 hours as needed for pain, (R. at 226), as well as Diclofenac, 75mg twice a day.  (R. at 227).

On February 16, 2007, Mr. Cummings saw Dr. Meding's physician assistant.  (R. at 253). The physician assistant observed that Mr. Cummings was able to get onto the examination table "safely" and got off the table "very well."  *Id.*  Mr. Cummings had a positive straight leg raise to about 4 inches off the table; also, he had no pain on internal or external rotation, abduction to 15º and flexion to 50º.  *Id.*

On March 19, 2007, Mr. Cummings visited Dr. Meding for an office examination.  (R. at 254).  Dr. Meding noted that Mr. Cummings had no complaints related to his hip, his gait was normal with no evidence of a limp, and he had pain-free range of motion.  *Id.*  X-rays showed well-positioned prosthetic components with no signs of loosening or wear.  *Id.*  Dr. Meding found Mr. Cummings to being doing well.  *Id.*  On the same day, Mr. Cummings saw his primary care physician Mark Benson, D.O., for medication refills.  (R. at 255).  Dr. Benson also noted that Mr. Cummings's extremities were within normal limits.  *Id.*

On May 9, 2007, John Belding, M.D., instructed Mr. Cummings to return for another office visit four months post surgery in late July, so that his disability status could be re-evaluated.  (R. at 255).  Dr. Meding continued to keep Cummings off of work until the July appointment.  *Id.*

On July 23, 2007, J. Sands, M.D., a state agency reviewing physician, completed a "Physical Residual Functional Capacity Assessment" on Mr. Cummings.  (R. at 256-63).  Dr. Sands concluded that Mr. Cummings can occasionally lift and/or carry 20 pounds, 10 pounds frequently, and sit, stand and/or walk about 6 hours in an 8-hour workday.  (R. at 257).  Dr.

Sands further concluded that Mr. Cummings can occasionally climb ramps/stairs, balance and crawl, frequently stoop, kneel and crouch, and can never climb ladders, ropes or scaffolds. (R. at 258). Dr. Sands cited Dr. Meding's March 19, 2007 examination findings in support of his determination. (R. at 257). Dr. Sands further assigned no manipulative, visual, communicative or environmental limitations (R. at 259-60) and concluded that Mr. Cummings was credible in regards to his symptoms. (R. at 261).

On July 27, 2007, Dr. Meding wrote a letter to the Indiana Carpenters Welfare Pension Fund regarding Mr. Cummings's status six months after his hip replacement surgery. (R. at 298). He noted that Mr. Cummings's hip was functioning "quite well," but he needed to have the following permanent work restrictions: (1) no lifting more than 20 pounds, (2) no standing more than 2 hours per 8-hour day, and (3) no running, jumping, stooping squatting, recurrent kneeling, bending or twisting. *Id.* In contradiction, Dr. Meding also wrote that Mr. Cummings was "permanently and totally disabled and unable to be gainfully employed." *Id.* Additionally, Mr. Cummings would need to have regular check-ups "at 1 year, 3, 5, 7, 10 years, etc." *Id.*

On August 16, 2007, Dr. Meding completed a "Physician's Statement of Disability" form for Mr. Cummings's carpenters union board of trustees, stating that Mr. Cummings was permanently and totally disabled and unable to be gainfully employed. (R. at 130). On August 29, 2007, Dr. Meding wrote a revised letter to the Indiana Carpenters Welfare Pension Fund regarding Mr. Cummings's status six months after his hip replacement surgery. (R. at 279). His single revision was adding a fourth permanent work restriction that stated there was to be "no sitting for prolonged periods." *Id.*

On October 1, 2007, Mr. Cummings returned to Dr. Meding's office with complaints of some pain in his right hip. (R. at 300). Dr. Meding found some tenderness over the greater

tronchanteric bursa and gave him an injection of Depo-Medrol in that spot to relieve his pain.  *Id.*
X-rays showed excellent position of all prosthetic components with no change and no interface
radiolucencies.  *Id.*  Dr. Meding indicated that if the pain did "not abate over the long run," he
would consider physical therapy.  *Id.*  On December 10, 2007, J.V. Corcoran, M.D., a state
agency reviewing physician, reviewed Mr. Cummings's residual functional capacity ("RFC"
assessment performed by Dr. Sands and concurred with his findings.  (R. at 301).

On December 15, 2008, Dr. Benson signed a form addressed to "Ladies/Gentlemen," that
stated, to the best of his medical knowledge, Mr. Cummings was "totally disabled without
consideration of any past or present drug and/or alcohol use."  (R. at 305).  It further stated that
drug or alcohol use was not a material cause of Mr. Cummings's disability.  *Id.*

On March 12, 2009, Mr. Cummings saw Dr. Benson for an office visit regarding
hypertension, high cholesterol, complaints of depression, and complaints of right hip pain, which
Mr. Cummings reported as "persistent hip pain, prevents from sitting any length of time, [and]
can't lift more than 20 pounds without a lot of pain."  (R. at 307).  Under examination, Dr.
Benson noted that Mr. Cummings had severe right hip pain with motion, but his extremities
appeared normal.  (R. at 309).  Dr. Benson adjusted Mr. Cummings's medications for
hypertension and high cholesterol, but did not prescribe any medication for the pain in his right
hip.  *Id.*  In regards to his right hip pain, Dr. Benson noted that Mr. Cummings was "trying to get
disability."  *Id.*  Mr. Cummings declined medication recommendations for his depression.  *Id.*

Over a month later, on April 14, 2009, Dr. Meding drafted a letter addressed to, "[w]hom
it may concern," regarding Mr. Cummings' condition.  (R. at 82).  In the letter, Dr. Meding
indicated that Mr. Cummings was "doing well" 2 years after his hip replacement surgery and that
his x-rays showed "excellent" position of the right hip.  *Id.*  Dr. Meding noted arthritic changes

6

in his left hip as well as his left knee, which is due to a history of left knee injury.  *Id.*  Dr. Meding indicated that Mr. Cummings needed "to continue with his restrictions of lifting no more than 20 pounds with no recurrent stooping and squatting," and that he "definitely need[ed] to take frequent breaks every 30 [to] 60 minutes" and take "20 [to] 30 minutes before . . . [being] allowed to sit again."  *Id.*

On May 5, 2009, Dr. Benson completed a "Multiple Impairment Questionnaire" regarding Mr. Cummings' condition.  (R. at 83-90).  Dr. Benson diagnosed Mr. Cummings as having stable hypertension and depression as well as worsening right hip pain and left knee pain.  (R. at 83).  For clinical findings that support his diagnosis, Dr. Benson noted that these impairments were indicated by subjective evidence of depressed mood and subjective evidence of hip and knee pain.  *Id.*  The impairments were also objectively indicated by evidence of loss of motion in Mr. Cummings's hip and knee, as well as pain with range of motion testing.  *Id.*  Dr. Benson noted that Mr. Cummings deals with this pain daily and it is precipitated by lifting, sitting and ambulating.  (R. at 85).  Dr. Benson estimated Mr. Cummings's pain level between 8 (moderately severe) and 9 (severe) on a scale of 0 to 10.  *Id.*  He noted further that he has not "been able to completely relieve [Cummings's] pain with medication without unacceptable side effects."  *Id.*  Dr. Benson indicated that Mr. Cummings could occasionally lift/carry up to 20 pounds, sit up to 1 hour and stand/walk up to 2 hours per 8-hour workday, and must get up and move around every 20 to 30 minutes, but not sit again for 5 to 10 minutes.  (R. at 85-86).  If placed in a competitive work environment, Dr. Benson opined, Mr. Cummings's symptoms would likely worsen.  (R. at 87).  Dr. Benson also indicated that Mr. Cummings's pain was severe enough that it would frequently interfere with his ability to concentrate and stay attentive.  (R. at 88).  In addition, although Mr. Cummings's depression was stable, it intensified his pain

symptoms.  *Id.*  Dr. Benson listed Mr. Cummings's prescribed medications, none of which were pain medications and each having no side effects.  (R. at 87).  Dr. Benson noted that Mr. Cummings will have psychological limitations, a need to avoid heights and temperature extremes, and can perform no pushing, pulling, kneeling, bending or stooping.  (R. at 89).

On June 15, 2009, Dr. Benson treated Mr. Cummings for poison ivy that might have been contracted after Mr. Cummings was in Mississippi the previous week.  (R. at 313).  Four months later, on October 13, 2009, Mr. Cummings again saw Dr. Benson for tobacco use disorder, hypertension, osteoarthritis of the right hip, left knee status post injury, high cholesterol, and depressive disorder.  (R. at 316).  In his clinical findings, Dr. Benson noted that Mr. Cummings was "awaiting [a] court decision on disability," and that from his perspective, Mr. Cummings was "certainly disabled."  (R. at 318.)  He also noted that Mr. Cumming's mood was stable and that Mr. Cummings had stopped taking Citalopram, an anti-depressant, due to erectile dysfunction.  (R. at 316.)

**C.      The Administrative Hearing**

**1.      Mr. Cummings's Testimony**

Mr. Cummings began his testimony by clarifying that he quit work on the day he became disabled, January 16, 2007, (R. at 33), and that he did not have a history of alcohol abuse.  (R. at 34).  Mr. Cummings testified that since his right hip replacement surgery, his hip has been very painful and uncomfortable.  *Id.*  Mr. Cummings stated that his orthopedic surgeon Dr. Meding had never stated that he had any complication from the hip replacement surgery.  (R. at 45).

Mr. Cummings testified that he suffered additional problems from a reconstructed ACL and meniscus on his left knee in 2003 performed by John R. McCarroll, M.D.  (R. at 34, 43.)  He stated the injury to his knee was work-related, and that he had not seen any doctor about his knee

since the ACL reconstruction.  (R. at 43.)  Plus, in the last six months, he has been suffering from a torn left bicep that occurred when he attempted to pull a trailer to use as a transport for a lawn mower.  (R. at 34, 36.)  Mr. Cummings testified that he had not seen any doctor about his bicep because he could not afford a doctor's visit, but he was sure the bicep was torn.  (R. at 42-43.)

Mr. Cummings described his hip pain as a pressure and as a throbbing pain that occurred daily.  (R. at 35).  The only time the pain eases is when he is in his recliner or lying in bed for awhile.  *Id.*  This pain, which has not changed in nature since the surgery, does not travel outside his hip. *Id.*  Mr. Cummings's left knee pain feels like a "sprained ankle" with "bone on bone," and that pain too stays in the same spot.  (R. at 35-36.)  He can walk 2 to 3 blocks before he has to stop due to the throbbing, hurting and fatigue, and he can stand for 20 to 30 minutes.  (R. at 36.)  After walking 2 to 3 blocks or standing for 20 to 30 minutes, Mr. Cummings testified he must sit down to ease the pain.  (R. at 37.)

Mr. Cummings stated he can only sit for up to 30 minutes and that is not "even comfortabl[e]."  *Id.*  After he sits for 30 minutes, he experiences throbbing and aching.  *Id.*  To relieve some of the pain, he adjusts his position or walks around for 20 minutes before sitting down again.  (R. at 37-38).  At the same time, he still feels the throbbing and aching while walking around and this affects his concentration.  (R. at 38).  The only time his focus is unaffected is when sitting in the recliner or lying in bed, but the pain is still present.  *Id.*

Mr. Cummings testified that he cannot lift over 20 pounds and has a lifetime restriction. *Id.*  He can lift 20 pounds with his right arm, his dominant hand and arm, for possibly about a third of the day, but he can lift very little with his left arm.  (R. at 38-39.)  Mr. Cummings stated that "holding a plate with food on it cramps" his left arm.  (R. at 39.)  He testified that he could pick up a half gallon of milk with his left arm but not a gallon of milk.  *Id.*

Mr. Cummings stated he takes the drug Tramadol for his pain.  *Id.*  On a pain scale of 0 to 10 with no medication, 0 being no pain and 10 being emergency room pain, Mr. Cummings rated his pain without medication on an average day to be 7.  (R. at 39-40).  Taking Tramadol, Mr. Cummings rated his pain on an average day to be 6.  (R. at 40).  Mr. Cummings testified that he has not tried any other pain medications, and the only side effect of Tramadol was occasional dizziness.  *Id.*  The dizziness would occur between 30 and 45 minutes after taking the medication and last for 15 to 20 minutes.  *Id.*

Mr. Cummings testified that his typical day involved eating breakfast at the kitchen table and sitting in the recliner and watching television for 8 to 10 hours.  *Id.*  He explained his typical day as a way to avoid hurting his hip.  (R. at 41).  He occasionally does laundry but he does not cook or clean or anything similar to those activities.  *Id.*

Mr. Cummings testified that he sees Dr. Meding for treatment of his hip.  *Id.*  He started seeing Dr. Meding in 2007 and had follow-ups every six months and recently once a year.  *Id.*  According to the medical expert, Dr. Hutson, the record showed that Mr. Cummings's last visit with Dr. Meding was in October 2007, but Mr. Cummings testified that he had seen Dr. Meding twice since 2007.  (R. at 43-44).  He also sees Dr. Benson every six months for his general health, including blood pressure, cholesterol, sleep, depression, as well as pain in his hip and knee and takes sleeping pills to aid in sleeping, however, he quit taking anti-depressant medication because it caused him to have erectile dysfunction.  (R. at 41-42).

### 2.    Medical Expert's Testimony

Dr. Hutson testified that with a total right hip replacement having no complications but continued pain in the right hip area, Mr. Cummings could lift 20 pounds occasionally but only stand for 2 hours in an 8 hour workday.  (R. at 45).  He also believed that Mr. Cummings could

sit for 6 hours in an 8 hour workday, but he would need a sit/stand option not to leave the workstation. *Id.* Mr. Cummings would need to be allowed to stand for up to 5 minutes out of every hour, and the 5 minutes would not have to be consecutive. *Id.*

After being handed a copy of a RFC form, the "Multiple Impairment Questionnaire" filled out by Dr. Benson on May 5, 2009, Dr. Hutson testified that Dr. Benson's notes about Mr. Cummings' high blood pressure and depression as well as worsening hip and left knee pain are "subjective complaints" of pain. (R. at 46.) These subjective complaints are not clinical findings. *Id.* Dr. Benson's note about objective loss of motion in the hip and knee lacks numbers to indicate the exact ranges of motion as well. *Id.* Dr. Hutson also stated that Dr. Benson's assessment that Mr. Cummings could stand or walk 1 to 2 hours was consistent with Dr. Meding's assessment. *Id.* He also stated that Trazadone was the only listed pain medication Mr. Cummings was on.[1] (R. at 47).

Dr. Hutson testified that of the doctors treating Mr. Cummings, he would take Dr. Meding's opinion first and Dr. Benson's opinion second. *Id.* The inconsistency in Dr. Benson's opinion with the record is the lack of clinical findings. *Id.* In addition, Mr. Cummings has not seen a doctor about his knee and he lacks x-rays. (R. at 48.) The same is true of the right hip because there are no x-rays to determine whether a complication has occurred after the surgery. *Id.*

Dr. Hutson further testified that he agreed with Dr. Meding's opinion that Cummings could not stand or walk for more than 2 hours, but his reasoning was related to prevention. (R. at 48-49.) According to Dr. Hutson, if a person with a hip replacement were allowed to walk six or more hours, he or she "may destroy another joint or have complications with a joint." (R. at 49.)

---

[1] It appears, however, that Trazadone is not a pain medication but rather an antidepressant drug. Richard J. Hamilton et al. eds., <u>Tarascon Pocket Pharmacopoeia</u> 144 (25th ed. 2011).

Allowing a person with a hip replacement to stand or walk up to 2 hours only allows that person "to work at their age [of] . . . 50 and be able to work in a sedentary capacity. *Id.* Dr. Hutson also stated that Cummings could ambulate effectively because he did not use a cane or walker. *Id.* When asked about whether he agreed with Dr. Benson's opinion that Mr. Cummings would need to get up and move around every 20 to 30 minutes, Dr. Hutson stated that he gave Mr. Cummings the sit/stand option, which included not leaving the workstation. *Id.* Mr. Cummings could get up 5 minutes at every hour and it did not need to be consecutive, like standing for 1 minute every 10 minutes in an hour. (R. at 50.)

### 3.     Vocational Expert's Testimony

Robert Barber, a certified rehabilitation counselor, testified that carpentry is medium skilled work with an SVP of 7. *Id.* A carpenter has no transferable skills to sedentary work. *Id.* The ALJ questioned the VE using a hypothetical with an individual of the same age, education and work experience as Mr. Cummings with the following limitations: (1) the individual is allowed to alternate between sitting and standing positions for five minutes per hour without leaving the individual's workstation, and (2) the individual is restricted to simple and repetitive work. (R. at 50-51). The VE stated that jobs were available in the region that this hypothetical individual could perform. (R. at 51). For example, pari-mutuel ticket checker is sedentary, unskilled work with a specific vocational preparation ("SVP") of 2, and 1,360 of those jobs existed in Indiana. *Id.* Hand packager is also sedentary, unskilled work with an SVP of 2, and 1,970 of those jobs existed in Indiana. *Id.* Finally, surveillance monitor is sedentary, unskilled work with an SVP of 2, and 260 of those jobs existed in Indiana. *Id.* The VE testified that his testimony had been in accordance with information provided in the Dictionary of Occupational Titles. *Id.*

12

On cross-examination, Mr. Cummings' counsel questioned the VE on how an individual's performance of these jobs would be affected if the individual had to leave the workstation for 5 minutes due to pain, or in the alternative, if the individual stayed at the workstation, but he or she was off task for those 5 minutes due to pain.  (R. at 52).  The VE testified that it would definitely preclude the individual from working as a surveillance monitor but probably would not impact either the pari-mutuel ticket checker job or the hand packager.  (R. at 52-53).  Finally, the VE testified that an individual that is able to only stand up to 2 hours in a workday and sit at least 6 hours fits the definition of sedentary as the Department of Transportation defines it.  (R. at 53.)

## II.  DISABILITY AND STANDARD OF REVIEW

To be eligible for DIB, a claimant must have a disability under 42 U.S.C. § 423(e) (2006).  "Disability" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . [that] can be expected to result in death or . . . [that] has lasted or can be expected to last for a continuous period of not less than 12 months."  § 423(d)(1)(A).  In determining whether a claimant is disabled, an ALJ applies a five step process set forth in 20 C.F.R. § 404.1520(a)(4):

1.  If the claimant is employed in substantial gainful activity, the claimant is not disabled.

2.  If the claimant does not have a severe medically determinable physical or mental impairment or combination of impairments that meets the duration requirement, the claimant is not disabled.

3.  If the claimant has an impairment that meets or is equal to an impairment listed in the appendix to this section and satisfies the duration requirement, the claimant is disabled.

4.  If the claimant can still perform the claimant's past relevant work given the claimant's residual functionality capacity, the claimant is not disabled.

> 5. If the claimant can perform other work given the claimant's residual functional capacity, age, education, and experience, the claimant is not disabled.

The burden of proof is on the claimant for the first four steps; it then shifts to the Commissioner at the fifth step. *Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992).

The Social Security Act, specifically 42 U.S.C. § 405(g), provides for judicial review of the Commissioner's denial of benefits. When the Appeals Council denies review of the ALJ's findings, the ALJ's findings become the findings of the Commissioner. 20 C.F.R. § 404.981; s*ee, e.g.*, *Henderson v. Apfel*, 179 F.3d 507, 512 (7th Cir. 1999). This Court will sustain the ALJ's findings if they are supported by substantial evidence. 42 U.S.C § 405(g); *Nelson v. Apfel*, 131 F.3d 1228, 1234 (7th Cir. 1999). This Court will "reverse the ALJ's findings only if they are not supported by substantial evidence or if the ALJ applied an erroneous legal standard." *Id.* In reviewing the ALJ's findings, the Court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the ALJ. *Nelson*, 131 F.3d at 1234. Although a mere scintilla of evidence is insufficient to support the ALJ's findings, the substantial evidence standard requires "no more than 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

The ALJ "need not evaluate in writing every piece of testimony and evidence submitted." *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993). However, the "ALJ's decision must be based upon consideration of all the relevant evidence." *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). Further, "[a]n ALJ may not select and discuss only that evidence that favors his ultimate conclusion, but must articulate, at some minimum level, his analysis of the evidence to allow the [Court] to trace the path of his reasoning. *Diaz*, 55 F.3d at 307. An ALJ's articulation

of his analysis "aids [the Court] in [its] review of whether the ALJ's decision was supported by substantial evidence." *Scott v. Heckler*, 768 F.2d 172, 179 (7th Cir. 1985).

### III.  DISCUSSION

**A.     The ALJ's Findings**

As reported in his decision, the ALJ found that Mr. Cummings met the disability insured status requirements of the Social Security Act through December 31, 2011, and that Mr. Cummings had not engaged in substantial gainful activity since the alleged onset date of January 16, 2007.  (R. at 20).  The ALJ found that Mr. Cummings suffered from the following impairments:   a history of osteoarthritis of the right hip with total right hip replacement, hypertension, hypercholesterolemia, gastroesophageal reflux disease and depression.  (R. at 20-21).   The ALJ found that Mr. Cummings's hypertension, hypercholesterolemia, and gastroesophageal reflux disease were not severe impairments and had no more than a minimal effect on his ability to do basic work activities.  (R. at 20).  The ALJ found nothing in the evidence to suggest "end organ damage" from these conditions or that these conditions "caused limitations in the claimant's functioning."  *Id.*  The ALJ also found that Mr. Cummings lacked "a mental impairment that cause[d] more than a mild restriction in his activities of daily living, ability to function socially or ability to maintain concentration, persistence and pace."  (R. at 21).  The ALJ noted that Dr. Benson had indicated on October 13, 2009 that Mr. Cummings' "mood was stable and he'd stopped Citalopram due to erectile dysfunction."  *Id.*  Thus, Mr. Cummings lacked a severe mental impairment.  *Id.*

The ALJ found that Mr. Cummings's history of osteoarthritis of the right hip with total right hip replacement was a severe impairment, but he lacked an impairment or combination of impairments that met or medically equaled one of the listed impairments found under Appendix

1 of 20 C.F.R. § 404.1520(d).  *Id.*  More specifically, Mr. Cummings's degenerative arthritis of the right hip did not meet or medically equal Listing 1.02A, meaning his impairment did not result in his "inability to ambulate effectively."  *Id.*  The ALJ found this conclusion to be consistent with the findings of the state agency medical consultants as well as the medical expert Dr. Hutson.  *Id.*

The ALJ assessed Mr. Cummings with a RFC to perform sedentary work as defined under 20 C.F.R. § 404.1567(a) with a sit/stand option, which allows him to change position for up to five minutes every hour at a workstation.  (R. at 21).  He accorded great weight to the opinions of Dr. Hutson and Dr. Meding because they were orthopedic specialists.  (R. at 23). The ALJ found that Dr. Meding stated in a letter dated August 29, 2007,  that Mr. Cummings "had permanent work restrictions of no lifting more than 20 pounds, no standing more than 2 hours per 8 hour day, no running, jumping, stooping, squatting or recurrent kneeling, bending or twisting, and no sitting for prolonged periods of time."  (R. at 22).  The ALJ also noted Dr. Hutson's review stating that Mr. Cummings should lift or carry 20 pounds occasionally, stand or walk no more than 2 hours in an 8 hour workday, and sit no more than 6 hours in an 8 hour workday with a sit/stand exception that allows him to change position for up to 5 minutes each hour.  *Id.*  The ALJ concluded that while the evidence indicated Mr. Cummings' impairments caused more than a minimal adverse effect on his ability to perform basic work activities, his impairments did not result in a severe disability.  (R. at 23).  Thus, Mr. Cummings's allegations regarding the impact of his impairments on his ability to perform work activities were "not fully credible."  *Id.*

Based on Mr. Cummings's assessed RFC, the ALJ found Mr. Cummings unable to perform any past relevant work.  *Id.*  The ALJ also concluded that prior to January 16, 2007, Mr.

Cummings was a younger individual, age 45-49, and that on September 3, 2009, his "age category changed to an individual closely approaching advanced age." *Id.* Prior to September 3, 2009, the transferability of job skills was not material to a disability determination because using the Medical-Vocational Rules "as a framework support[ed] a finding that [Cummings was] 'not disabled.'" *Id.* However, starting on September 3, 2009, the ALJ found that Mr. Cummings did not have transferable job skills. *Id.*

Prior to September 3, 2009, the ALJ concluded that given Mr. Cummings' age, education, work experience, and RFC, Mr. Cummings could perform jobs that existed in significant numbers in the national economy, (R. at 23), and therefore Mr. Cummings was not disabled. (R. at 25). Beginning on September 3, 2009 and continuing through the date of the ALJ's decision, considering Mr. Cummings's age, education, work experience, and RFC, Mr. Cummings could not perform any jobs that existed in significant numbers in the national economy and therefore Mr. Cummings was disabled. (R. at 24-25).

**B.    Mr. Cummings' Arguments on Appeal**

Concerning the period of January 16, 2007 through September 2, 2009, Mr. Cummings argues the ALJ erred in his RFC determination because he ignored contrary evidence in the record and provided a flawed hypothetical to the vocational expert. The Commissioner contends the former reason constitutes harmless error and the latter reason lacks merit. Mr. Cummings's second argument is the ALJ's credibility assessment was flawed because he failed to comply with SSR 96-7p in assessing his symptoms.

Mr. Cummings asks this Court to reverse the Commissioner's decision and award benefits, or in the alternative, remand his case for further administrative proceedings. Because a flawed credibility assessment demands a remand unless the claimant's testimony is incredible or

the ALJ has explained how he would reach the same decision if he had found the claimant credible, *Eskew v. Astrue*, No. 10-3951, 2011 WL 6009005, at *4 (7th Cir. Dec. 2, 2011), the Court begins with Cummings's 96-7p argument.

### 1.    Application of SSR 96-7p

Mr. Cummings asserts that the ALJ failed to comply with SSR 96-7p because the ALJ found that Mr. Cummings lacked full credibility without giving any specific reasons.  In other words, the ALJ's decision gave no indication that he considered the listed factors under SSR 96-7p and 20 C.F.R. § 404.1529(c)(3)(i)-(vii) when assessing the credibility of Mr. Cummings' statements, and thus, he did not make clear what weight he accorded Mr. Cummings' testimony.

As part of the RFC determination, the ALJ must consider all of the claimant's symptoms. 20 C.F.R. § 404.1529; SSR 96-4p, 61 Fed. Reg. 34488 (July 2, 1996); SSR 96-7p, 61 Fed. Reg. 34483 (July 2, 1996).  In considering the claimant's symptoms, the ALJ first determines whether a medically determinable impairment exists that could reasonably be expected to produce the claimant's symptoms.   20 C.F.R. § 404.1529; SSR 96-4p; SSR 96-7p.  If a medically determinable impairment exists, the ALJ then evaluates the intensity, persistence and functionally limiting effects of the claimant's symptoms to determine how those symptoms affect the claimant's capacity to work.  *Id.*  Thus, the ALJ is required to make a credibility assessment of the claimant's statements regarding his or her symptoms and their functional effects.  SSR 96-7p.

Because certain symptoms, such as pain, are inherently subjective, the ALJ needs to "carefully consider" information submitted by the claimant regarding his or her symptoms in reaching a decision "about the credibility of the [claimant's] statements if a disability determination or decision that is fully favorable to the [claimant] cannot be made solely on the

basis of objective medical evidence." *Id.*; *see also* 20 C.F.R. § 404.1529(c)(3).  In making this credibility assessment, the ALJ is required to consider all available evidence in the record, including objective medical evidence, the claimant's statements about symptoms, information and statements provided by the claimant's treating or nontreating physicians as well as others regarding the symptoms and how they affect the claimant, and any other relevant evidence within the record.  SSR 96-7p; *see also* 20 C.F.R. § 404.1529(c)(3).  The ALJ must also consider the following factors:

1. the individual's daily activities;

2. the location, duration, frequency, and intensity of the individual's pain or other symptoms;

3. factors that precipitate and aggravate the symptoms;

4. the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

5. treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

6. any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

7. any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96-7p; *see also* 20 C.F.R. § 404.1529(c)(3).

The ALJ's determination "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight."  SSR 96-7p.  The ALJ cannot make a "single, conclusory statement" that states the claimant's symptoms have been considered or that the ALJ finds the allegations not credible.  *Id.*  In *Parker v. Astrue*, for instance, Judge Posner held that

19

this type of "meaningless boilerplate" is not sufficient to give a claimant an understanding of the amount of weight the judge accorded the claimant's testimony.  597 F.3d 920, 921-22 (7th Cir. 2010).

After finding that Mr. Cummings had the RFC to perform sedentary work with a sit/stand option, the ALJ stated that he had considered all of Mr. Cummings' symptoms to the extent to which they were reasonably consistent with the objective medical evidence and other evidence as required by 20 C.F.R. § 404.1529 and SSR 96-7p.  The ALJ then gave a recapitulation of Mr. Cummings' medical history, noting Mr. Cummings's surgery and two office visits with Dr. Meding, and then a restatement of Dr. Hutson's evaluation of Mr. Cummings's limitations.  The ALJ concluded that because the evidence showed Mr. Cummings's impairments only caused a minimal adverse impact on his ability to perform work-related activities, Mr. Cummings's allegations were "not fully credible."  (R. at 23).

This Court finds the ALJ's statements regarding consideration of Mr. Cummings's symptoms and allegations to be the type of boilerplate that the Seventh Circuit has deemed inadequate.  Although the Commissioner argues the ALJ's credibility determination is supported by substantial evidence, the ALJ has failed to give an analysis that carefully considers evidence submitted by Mr. Cummings and that gives him specific reasons for not finding his allegations regarding his symptoms as fully credible.

Social Security Ruling 96-7p states that "[t]he reasons for the credibility finding must be grounded in the evidence and articulated in the . . . decision."  *See also Rohan v. Chater*, 98 F.3d 966, 971 (7th Cir. 1996) (stating that the ALJ must "sufficiently articulate his assessment of the evidence and . . . enable [the court] to trace the path of the ALJ's reasoning.").   The Commissioner argues that the ALJ concluded that Mr. Cummings's allegations were not fully

credible because after October 2007 Mr. Cummings did not receive any further treatment for his right hip and Dr. Benson only treated conditions other than his right hip.  Although the ALJ's decision restates the facts of Mr. Cummings's medical history, the ALJ never articulates the reasoning submitted by the Commissioner.  In fact, the ALJ's decision lacks almost any reference to Mr. Cummings's testimony, other than the singular statement that Mr. Cummings "testified that he continues to have right hip pain."  (R. at 22); *see Young*, 957 F.2d at 392 (stating ALJ's failure to address claimant's testimony makes appellate review inadequate to assess the ALJ's reasoning).

Even if this an accurate reflection of the ALJ's reasoning, it is flawed because the ALJ did not seek an explanation from Mr. Cummings for the infrequency of his doctors' visits. Although a claimant's statements may be given less credence because a claimant failed to seek treatment or the "frequency of treatment is inconsistent with the level of the complaints," the ALJ cannot draw any inferences without first considering any explanations the claimant might have for infrequent medical visits or the failure to seek treatment.  SSR 96-7p; *see also Craft v. Astrue*, 539 F.3d 668, 679 (7th Cir. 2008) (stating an ALJ cannot draw an inference from failure to follow a treatment plan or seek treatment until the ALJ has "explored the claimant's explanations as to the lack of medical care"); *Parker*, 597 F.3d at 922 (stating that if the ALJ was troubled by the claimant's lack of seeking further treatment for her pain, then the ALJ needed to elicit an explanation).  Despite testifying to seeing Dr. Benson every six months and Dr. Meding once a year, the ALJ made no inquiry as to why Mr. Cummings' visits with his physicians were so infrequent in spite of allegedly debilitating hip pain that left him lying in a recliner for eight hours a day.  The same analysis applies if the ALJ did not believe that Mr. Cummings saw Dr. Meding once a year after October 2007.  Dr. Hutson asked Mr. Cummings why he had not seen a

doctor for his alleged bicep tear, which Mr. Cummings testified was due to his inability to afford a doctor's visit. The same reasoning could have applied to his lack of visits with his treating physicians. *See Craft*, 539 F.3d at 679 (stating that a claimant's inability to pay for medical treatment is a reason that can "'provide insight into the individual's credibility'") (quoting SSR 96-7p).

In addition, the ALJ cannot select only the evidence that favors his conclusion, but rather the ALJ must also "confront evidence that does not support his conclusion and explain why it was rejected." *Kasarsky v. Barnhart*, 335 F.3d 539, 543 (7th Cir. 2002). During oral testimony, Dr. Hutson pointed out to Mr. Cummings that the record indicated his last office visit with Dr. Meding was in October 2007. Mr. Cummings testified that he had actually seen Dr. Meding twice since 2007, one visit being in April 2009, and that he had records to substantiate these visits. Neither Dr. Hutson nor the ALJ asked any follow-up questions to this testimony, such as whether those alleged visits were attempts to seek treatment or why those records were absent from his case record. Again, the ALJ's decision fails to discuss this testimony as well, including whether Mr. Cummings's alleged April 2009 visit could have corresponded with Dr. Meding's April 14, 2009 letter regarding Mr. Cummings's condition.

In regards to the factors under SSR 96-7p and 20 C.F.R. § 404.1529(c)(3), the Commissioner argues the ALJ did discuss Mr. Cummings's daily living activities by making a reference to his trip to Mississippi in June 2009. A one-time trip, however, is not a discussion of Mr. Cummings's daily activities. The ALJ never discusses Mr. Cummings's testimony that he spends almost the entirety of his day lying in a recliner as a way to deal with his hip pain. Nor does the ALJ discuss that Mr. Cummings occasionally does laundry but does not cook or clean. Although the Commissioner's appealing inference that Mr. Cummings's ability to take a trip

down to Mississippi undermines his claim of being able to sit for prolonged periods, the Court cannot accept the Commissioner's argument because it would violate the *Chenery* doctrine, "which forbids an agency's lawyers to defend the agency's decision on grounds that the agency itself had not embraced." *Parker*, 597 F.3d at 922. The ALJ merely mentions the Mississippi trip in passing and offers no analysis of what the trip could possibly mean in terms of Mr. Cummings's credibility.

In regards to the location, duration, frequency, and intensity of Mr. Cummings's pain or other symptoms and factors that precipitate and aggravate the symptoms, the Commissioner makes no argument to contest the ALJ's lack of consideration of these factors. Again, the ALJ's discussion lacks any references to Mr. Cummings's testimony on his pain, other than that he continues to have pain. Thus, it does not appear the ALJ gave Mr. Cummings's statements regarding his pain any consideration. *See* 20 C.F.R. § 404.1529(c)(3).

In terms of Mr. Cummings's medications, the Commissioner argues that no evidence showed that either of Mr. Cummings's treating physicians prescribed him Tramadol, which Mr. Cummings alleged he was taking for his hip pain. Again, to accept the Commissioner's argument would be to violate the *Chenery* doctrine. *See Parker*, 597 F.3d at 922. Although the ALJ did state that Mr. Cummings had not been prescribed pain medication by Dr. Benson, he did not discuss that he found *no evidence* that Mr. Cummings had been prescribed Tramadol or any other pain medication from any other doctor. In addition, the ALJ's decision lacked any discussion of his other medications. Specifically, Mr. Cummings testified that he quit taking his depression pill because it gave him erectile dysfunction. This fact is relevant to the intensity of Mr. Cummings's pain because Dr. Benson stated in his May 2009 report that depression

intensifies Mr. Cummings's pain symptoms.   Yet, none of this is considered in the ALJ's decision.

As to treatment, other than medication, used to treat Mr. Cummings's pain or any measure used to relieve his pain, the ALJ's decision, as stated before, fails to discuss Mr. Cummings's testimony of lying in the recliner to relieve his pain or needing to take breaks from sitting every 30 minutes with 20 minutes lag time before sitting again.   In regards to factors concerning Mr. Cummings's functional limitations due to pain or other symptoms, the ALJ's decision offers no discussion on Mr. Cummings's testimony that the pain affects his ability to concentrate and focus.   *See* SSR 96-7p (stating that the ALJ cannot disregard the effect of symptoms on claimant's ability to work because they are not supported by objective medical evidence).

In sum, the ALJ's failure to consider contrary evidence to his credibility determination and his failure to follow the proper assessment of credibility as dictated by SSR 96-7p necessitates remand.   The ALJ's credibility determination fails to make clear to Mr. Cummings and this Court the weight he accorded Mr. Cummings's statements and the reasons for that weight.   SSR 96-7p.   The Court is by no means suggesting the ALJ was incorrect in his credibility determination; that will be for the ALJ to determine on remand.   Rather, the crux of this Court's decision is that the ALJ needs to do a better job of "showing his work," thus enabling the Court and Mr. Cummings to "build an accurate and logical bridge from the evidence to his conclusion."   *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000).   Mr. Cummings's counsel is correct when he writes that "[t]he ALJ never actually explained how [96-7p] was applied to the facts and circumstances of this case." (Dkt. 14 at 16).

2.      **RFC Determination**

Mr. Cummings argues that the ALJ erroneously determined he is capable of full time sedentary work because the ALJ ignored specific evidence in the record to the contrary and provided a flawed hypothetical to the VE.  If a claimant has a severe impairment but one that does not meet or equal an impairment within the listed impairments under Appendix 1, then the ALJ must make an RFC assessment to determine what work-related activities, if any, the claimant can still perform despite his or her limitations.  20 C.F.R. § 404.1520(e); SSR 96-8p, 61 Fed. Reg. 34474 (July 2, 1996).  The ALJ uses the RFC assessment at step 4 of his evaluation of disability to determine if the claimant can perform past relevant work and at step 5 to determine if the claimant can adjust to other work.  20 C.F.R. § 404.1520(e).  The RFC assessment must be based on all the relevant evidence within a record, and it "must always consider and address medical source opinions."  SSR 96-8p.  Further, if a "RFC assessment conflicts with an opinion from a medical source, the [ALJ] must explain why the opinion was not adopted."  *Id.*

a.      **Medical Evidence**

Mr. Cummings asserts that the ALJ erred in his RFC assessment by relying on certain statements by Dr. Meding that supported his conclusion but ignoring other statements by Dr. Meding that were unsupportive of his conclusion.  Mr. Cummings points out that the ALJ's RFC assessment failed to mention Dr. Meding's April 14, 2009 letter which stated that Mr. Cummings "definitely need[ed] to take frequent breaks every 30 [to] 60 minutes" and take "20 [to] 30 minutes before . . . [being] allowed to sit again."  (R. at 82).  This statement is clearly inconsistent with a RFC assessment that permits Mr. Cummings to sit for up to six hours with only five minutes each hour to adjust his position.  Because the April 2009 medical opinion of Dr. Meding is inconsistent with the RFC assessment, this Court finds that the ALJ needed to

provide an explanation why that opinion was not followed.  *See* SSR 96-8p.  As a result, the ALJ was in error in not providing this explanation.

The Commissioner concedes that it was an error for the ALJ to not explain why he had not adopted Dr. Meding's April 2009 medical opinion; however, the Commissioner submits that the ALJ's oversight was harmless error.  The Court acknowledges this argument, which has some appeal, but the Court has already determined that remand is appropriate so that the ALJ can complete a new credibility determination.  It follows, then, that the ALJ should go ahead and revisit this issue as well.

### b.  Flawed Hypothetical

Lastly, Mr. Cummings argues the sit/stand option within the RFC assessment is contrary to social security disability law, and as a result, the VE was provided a flawed hypothetical. Social Security Ruling 83-12, 65 Fed. Reg. 75759 (Dec. 4, 2000) states,

> There are some jobs in the national economy--typically professional and managerial ones--in which a person can sit or stand with a degree of choice.  If an individual had such a job and is still capable of performing it, or is capable of transferring work skills to such jobs, he or she would not be found disabled. However, most jobs have ongoing work processes which demand that a worker be in a certain place or posture for at least a certain length of time to accomplish a certain task.  Unskilled types of jobs are particularly structured so that a person cannot ordinarily sit or stand at will.  In cases of unusual limitation of ability to sit or stand, a [vocational expert] should be consulted to clarify the implications for the occupational base.

In *Johnson v. Barnhart*, the district court focused on the language that "unskilled . . . jobs are particularly structured so that a person cannot ordinarily sit or stand at will," and held that unskilled jobs cannot have a sit/stand option per SSR 83-12.  No. 04-3438CVWHFS, 2006 WL 373896, at *8 (W.D. Mo. February 16, 2006).  As a result, the court held that because the claimant needed a sit/stand option but could only work unskilled jobs, the claimant must be found disabled.  Mr. Cummings contends this is the correct interpretation of SSR 83-12, and the

26

ALJ should not have posed a hypothetical of an individual capable of performing unskilled work with a sit/stand option.

Notably, however, in *Harcourt v. Barnhart*, this Court squarely rejected the *Johnson* interpretation of SSR 83-12.  *See Harcourt*, No. 1:05-cv-0666-DFH-VSS, 2007 WL 141931, at *6 (S.D. Ind. Jan. 5, 2007).  Because SSR 83-12 uses the word, "ordinarily," this means it does not adopt "a blanket finding that no unskilled jobs allow a sit/stand option." *Id*.  Like the ALJ in *Harcourt*, this ALJ also followed the last line of instruction in SSR 83-12 by consulting a vocational expert about this limitation and its implications on unskilled jobs. *Id.*

And, more importantly, the Seventh Circuit effectively rejected the reasoning in *Johnson* in *Powers v. Apfel*, 207 F.3d 431, 436-37 (7th Cir. 2000).  The vocational expert in *Powers* testified that 40,000 unskilled jobs with a sit/stand option existed in the national economy. *Id.* at 432, 434, 436.  The court held that the description of what is "ordinarily" in SSR 83-12 "does not refute, by itself, the opinion of an expert in response to a specific question." *Id.* at 436.  As this Court found in *Harcourt*, this same reasoning used in *Powers* applies to this case as well. *Harcourt*, 2007 WL 141931, at *6.

## IV.  CONCLUSION

For the reasons stated herein, the decision of the Commissioner of Social Security in this case is **REMANDED** for further proceedings consistent with this opinion.

SO ORDERED.   06/26/2012

Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

Charles D. Hankey
charleshankey@hankeylawoffice.com

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov